_____

| | |
|---|---|
| In re: | ) |
| | ) |
| STRATA TITLE, LLC            CH: 11 | )  2:12-BK-24242-DPC |
| | ) |
| 1) ARIES HOLDINGS, LLC vs STRATA TITLE, | )  ADV: 2-13-00057 |
| LLC & JOHN LUPYPCIW & STUDIO CITY | ) |
| LOFTS, LLC AND ARIZONA BUSINESS BANK | ) |
| & REED HATKOFF & JANE DOE HATKOFF & | ) |
| THE ELAINE KIRSCH REVOCABLE TRUST | ) |
| | ) |
| ORAL ARGUMENT RE: MOTION FOR REMOVAL | ) |
| | ) |
| 2) MOTION TO DETERMINE (1) MOTION FOR | ) |
| ORDER CLEARING (A) THE SANTERRA | ) |
| APARTMENTS LLC OPERATING AGREEMENT | ) |
| IS NOT AN EXECUTORY CONTRACT; (B) | ) |
| THE PURCHASE OPTION IN THE OPERATING | ) |
| AGREEMENT IS ENFORCEABLE AGAINST | ) |
| DEBTOR; AND (C) THE AUTOMATIC STAY | ) |
| DOES NOT PRECLUDE EXERCISE OF FAIR | ) |
| MARKET VALUE PURCHASE OPTION; (2) | ) |
| ALTERNATIVE MOTION FOR STAY RELIEF; | ) |
| AND (3) ALTERNATIVE MOTION TO | ) |
| REQUIRE DEBTOR TO ASSUME OR REJECT | ) |
| OPERATING AGREEMENT FILED BY K. | ) |
| LAYNE MORRILL OF MORRILL & ARONSON | ) |
| PLC ON BEHALF OF SAM REI, LLC | ) |
| | ) |
| 3) STRATA TITLE, LLC vs MORRILL & | )  ADV: 2-13-00221 |
| ARONSON, P.L.C. & LAYNE MORRILL & | ) |
| SAM REI, L.L.C. & SAM III L.L.C. | ) |
| | ) |
| MOTION FOR PRELIMINARY INJUNCTION | ) |
| AND TRO FILED BY RONALD J. ELLETT OF | ) |
| ELLETT LAW OFFICES, P.C. ON BEHALF | ) |
| OF STRATA TITLE, LLC | ) |
| | ) |
| 4) MOTION FOR JOINT ADMINISTRATION OF | ) |
| CASE WITH BANKRUPTCY CASE AND TO | ) |
| TRANSFER CASE 13-BK-1632 TO THIS | ) |
| COURT FILED BY RONALD J. ELLETT OF | ) |
| ELLETT LAW OFFICES, P.C. ON BEHALF | ) |
| OF STRATA TITLE, LLC. | ) |

_____

```
                                        U.S. Bankruptcy Court
                                        230 N. First Avenue, Suite 101
                                        Phoenix, AZ 85003-1706

                                        March 20, 2013
                                        10:33 a.m.

              BEFORE THE HONORABLE DANIEL P. COLLINS, Judge
                        (Designation of Record)


APPEARANCES:

For the Debtor:                 Ronald J. Ellett
                                ELLETT LAW OFFICES, P.C.
                                2999 North 44th Street
                                Suite 330
                                Phoenix, AZ 85018


For Aries Holdings, LLC:        Daniel R. Lord
                                BEER & TOONE, PC
                                76 E Mitchell Drive
                                Phoenix, AZ 85012


For The Elaine Kirsch          Warren J. Stapleton
Revocable Trust:                OSBORN MALEDON
                                2929 N. Central Avenue
                                Suite 2100
                                Phoenix, AZ 85012


For SAM REI, LLC and SAM III,  Layne Morrill
LLC:                            MORRILL & ARONSON P.L.C.
                                One East Camelback #340
                                Phoenix, AZ 85012
```

Proceedings recorded by electronic sound technician, Kayla
Colasont; transcript produced by AVTranz.

1  (10:33 a.m.)

2        THE COURT:  All right.  The next matter is Adversary

3  number 12-24242.  Oh, I'm sorry, that's the administrative

4  case.  The administrative case 12-24242.  And Mr. Morrill, I

5  believe this is your issue.  Mr. Morrill, for the sake of the

6  crowd who hasn't read the pleadings here, why don't you give a

7  quick little review as to what you're trying to accomplish and

8  then go into your argument.

9        MR. MORRILL:  Certainly.  Your Honor, I represent two

10  LLCs that are controlled by a gentleman named Steven Martori.

11  Those two LLCs collectively own a 55 percent interest in

12  Santerra Apartments LLC.  The other 45 percent interest in

13  Santerra Apartments LLC is owned by the Debtor.

14        The manager of Strata -- of Santerra Apartments LLC

15  is Mr. Lupypciw.  The LLC, Santerra Apartments LLC, owns and

16  operates a 140 I believe unit apartment complex in Phoenix.

17        THE COURT:  That is the sole asset of Santerra?

18        MR. MORRILL:  That is the sole asset of Santerra, the

19  real property and associated personalty.

20        The reason that we filed the motions that we did,

21  Your Honor, is that my clients attempted to extricate

22  themselves from the collateral impact of the Strata bankruptcy

23  by offering to purchase the interest of Strata in Santerra

24  Apartments LLC for cash.  We thought that response would be met

25  with some degree of joy from a Debtor in a Chapter 11

1  bankruptcy case because it would have provided significant

2  liquidity.

3          Instead Mr. -- instead Strata through its counsel

4  threatened to sue not only my clients but my law firm and

5  myself for following up on that by sending a letter to the

6  Debtor's counsel calling his attention to a provision of the

7  operating agreement of Santerra LLC which provides that upon

8  the occurrence of an event of withdrawal, that the

9  non-withdrawing member has the option to purchase the interest

10  of the withdrawing member.  And that purchase option is not at

11  some discounted value.  It's not at some book value or some

12  formula value.  It's not at any discount from fair market

13  value.

14          The fair market -- the purchase option says we're

15  going to get an appraisal of the apartment complex and that's

16  going to determine the fair market value of the assets.  Then

17  we're going to determine how much would be distributed to

18  Strata under the operating agreement if the entity paid off its

19  debts and then made distributions in accordance with the

20  operating agreement.

21          So not only is it a fair market value purchase, it is

22  also the making of a market for an otherwise unmarketable

23  interest in an LLC.  A minority interest and Strata Title was

24  not the manager.  So --

25          THE COURT:  In other words, the value of the entire

1    apartment complex may be X, but the value of Strata's 45

2    percent interest is not 45 percent of X?

3            MR. MORRILL:  That's correct.  It may be 65 percent

4    of 45 percent of X based upon the valuation discounts that

5    business appraisers usually employ in valuing non-controlling

6    unmarketable interests in LLCs.

7            So after Strata's counsel threatened to sue my

8    clients, myself and my law firm for allegedly violating the

9    automatic stay by writing these two letters, we filed these

10   motions with the Court seeking a declaration from the Court on

11   a number of issues.  And it is those issues that bring us here

12   today.

13           Your Honor, we filed this morning a response, I'm

14   sorry, a reply to the Debtor's response that was filed

15   yesterday afternoon.

16           THE COURT:  I have a copy, but I haven't --

17           MR. MORRILL:  You do?

18           THE COURT:  -- finished reading it yet.

19           MR. MORRILL:  Okay.  I brought an extra copy in case

20   you hadn't seen it.  We also filed today a form of order --

21           THE COURT:  I see that on the docket.

22           MR. MORRILL:  -- on stay relief.  Do you have that as

23   well?

24           THE COURT:  I see it on the docket.

25           MR. MORRILL:  Okay.  So basically, Your Honor, we're

1    the innocent bystander as far as my clients are concerned.  We

2    went into business with Strata and Mr. Lupypciw as manager.  We

3    -- my clients put up a million dollars in capital for the down

4    payment on the apartment complex.  Strata put up nothing other

5    than its, quote, sweat equity.  And we have already been

6    impacted and desire not to be further impacted by the pendency

7    of Strata Title's bankruptcy.

8            So we are asking the Court to declare number one,

9    that we did not violate the automatic stay or alternatively, if

10   the Court believes that stay relief is necessary, that the

11   Court grant stay relief so that we can continue the process of

12   extricating ourselves from this venture with Strata Title that

13   is causing us difficulty and undue expense by dealing with this

14   bankruptcy.

15           Secondly, we have asked the Court for a determination

16   that the operating agreement is not an executory contract.  And

17   that it does not -- and that it is not rendered unenforceable

18   by § 541(c)(1) of the Code.

19           We viewed those as sort of preliminary issues to the

20   real relief we are seeking which is the ability to exercise the

21   pre-bankruptcy mutual agreement of the parties as to how a

22   party could extricate itself if another member went into

23   bankruptcy.

24           THE COURT:  That's the sole basis for the buyout, the

25   effort to push Strata out of the entity, is that right?  The

1    filing of the bankruptcy is the sole reason?

2            MR. MORRILL:  That's correct, Your Honor.

3            THE COURT:  Okay.

4            MR. MORRILL:  It is.

5        (End of Portion Designated for Transcription)

6                              * * *

7    (11:03 a.m.)

8            MR. MORRILL:  But if before the process reaches

9    conclusion, a transaction occurs, closes in which the apartment

10   complex is sold, the buy-sell procedure will be aborted and the

11   entity will be liquidated and they will get in cash, Strata

12   will get in cash what it is entitled to under the operating

13   agreement rather than 15 percent down and a note, five-year

14   note for the balance.

15           THE COURT:  Okay.  We're set.

16           MR. MORRILL:  Thank you, Your Honor.

17           THE COURT:  Thank you, Mr. Morrill.  Mr. Ellett.

18           MR. ELLETT:  Your Honor, I think this will be

19   insightful for our audience because they'll get to see just two

20   very different versions of what happened and that often happens

21   in the court.

22           First of all, Mr. Morrill would make out that he's

23   here to help my client and buy it at fair market value.  We'd

24   be happy to sell our interest at fair market value and have

25   offered to do that.  What's going on here, Your Honor, is not a

1  Debtor who's refusing cash, which would be absurd.  It's a

2  Debtor who's saying you can't take our interest through this

3  artificial procedure at less than we know we're about to get

4  through a sale either to this buyer or the next one.

5        Now the offer that he's talking about and he's raised

6  it in his -- he's submitted as well his letter, his offer was

7  to buy our assets as if or to buy our membership interest as if

8  the assets of the company were valued at 3.86 million.  He made

9  that offer at a time that we had an accepted contract at 4.375

10 million.  His offer was more than half of a million dollars

11 less than what we thought we were about to receive in cash.

12       Furthermore, he wouldn't be paying us cash.  He would

13 be paying us 15 percent down and giving us an unsecured note

14 that we don't know that we would ever collect upon.  It's an

15 unsecured note from an LLC.  That's not fair market value.

16 That's an artificial procedure that will hurt my client.

17       Now, Mr. Morrill complains that he asked me for a

18 contract in late February and then lo and behold yesterday, I

19 announced I've seen a contract.  Well, I got the contract

20 yesterday.  It's a new contract, as he's pointed out to the

21 Court.  It's for 4.5 million.  And that's indicative of what's

22 going on in the Phoenix market right now.  Prices are rising.

23       So we're now at a situation where we have an accepted

24 offer at 4.5 million.  And by the way, it's our position that

25 the Martori entities have given the manager authority to sell

1    at that price.  But if they haven't, that's something that we

2    can work out through them with -- or go to state court to

3    determine.

4              THE COURT:  If this is a sale that your client wishes

5    to pursue, is it something you're going to bring to the Court

6    on a 363 sale or do you think you can do that outside the

7    court?

8              MR. ELLETT:  Well, we're not selling our membership

9    interest.

10             THE COURT:  I understand.

11             MR. ELLETT:  Santerra is selling theirs.

12             THE COURT:  You're selling the property itself.

13             MR. ELLETT:  So my answer is I think Santerra can

14   sell property itself as long as it has the consent of the

15   parties.  And I don't understand any reason why the Martori

16   entities would oppose the sale at $4.5 million.

17             Your Honor, this is what is also -- and you've

18   already put your finger on this.  This is not a creditor coming

19   in saying protect our interest.  This is a partner to whom we

20   have not defaulted in any way coming in and saying, "Let me use

21   this artificial procedure to take care of my little partner

22   here and give him 15 percent down and this note."

23             This is clearly an attempt to harm the estate.  It's

24   a naked attempt to do so.  And Mr. Morrill's arguments that

25   he's trying to provide liquidity is simply not true.  You know,

1    15 percent of what they offered us would be less than what our

2    fees will be already incurred that he has caused by his

3    actions.

4          The appraisal is an artificial procedure that could

5    end up in arbitration.  Dragging us into another legal

6    proceeding and when a Debtor files a bankruptcy, he's supposed

7    to be safe from these types of actions.  The bankruptcy is not

8    supposed to create them and that's what's happened here.

9          Now, the stay is to be interpreted broadly.

10    11 U.S.C. 362 prevents any action to exercise control over

11    property.  This is plainly an attempt not only to exercise

12    control over our property but to take it from us.  And to take

13    it from us on terms that we're not willing to accept because

14    they're not fair.

15          And so and you know I also want to -- this is a legal

16    argument that is often used in opinions.  When you make an

17    argument of which the result would always be absurd,

18    Mr. Morrill says basically that if you've had past performance,

19    well that can't be part of an executory contract because it's

20    already done.  But if you have future obligations that you owe,

21    well those are hypothetical.  So those can't count.  Well, if

22    it's not past and it's not future, it would have to be

23    something that what, is literally an obligation that occurred

24    during the hearing for it to be an executory contract?  That

25    can't make any sense.

1          In this particular instance, we've already got two

2  things that have popped up in the executory contract that are

3  obligations that my client has to do and so does Mr. Martori's.

4  His -- the first one is we have to agree on whether or not this

5  current purchase is -- this contract is acceptable.  That's an

6  obligation the parties have to do to manage.

7          Secondly, if his interpretation is right that he can

8  go forward with this, we have to participate in this double

9  arbitration or double appraisal arbitration procedure.  That's

10  another obligation that we're stuck with.  We don't want to do

11  that.  We're willing to sell this, we'll sell him the interest

12  right now at 4.5, valued at $4.5 million, which is what we have

13  an offer for.  We'll be happy to do that.  We'll even talk

14  about a slight discount.  He knows that.  But that's not what

15  his letter was.  His letter wasn't, "Hey, we want to negotiate

16  with you in good faith."  His letter is, "We're forcing you to

17  sell.  Here you go, buddy, we're starting the procedure."  And

18  that's to what we objected.

19          THE COURT:  You view the triple A arbitration process

20  a present performance obligation on your part making this

21  executory?

22          MR. ELLETT:  If we assume that he's correct that it's

23  not a stay violation and that 541(c) doesn't prevent him from

24  going forward with this, I think it would be a present

25  obligation that we would have as to participate in this

AVTranz
www.avtranz.com · (800) 257-0885

1   valuation process that he's trying to thrust upon us.  I mean

2   the alternative is just hope his appraiser comes up with a

3   number that's -- that we like.  So we would be drug (sic) into

4   that.  We would obviously go get our own appraiser.

5        And as Your Honor knows, it's no coincidence that

6   when a party is going to be favored by a high appraisal, they

7   come in with the higher of the two appraisals before the Court.

8   And when a party is going to be favored by a low appraisal,

9   their appraiser comes in with the lower number.  That happens

10  every time that there's ever been a hearing in American

11  jurisprudence on value.

12        And so of course we would have to go and participate

13  in this procedure.  But it's artificial and it's not fair.  We

14  don't have to do it.

15        THE COURT:  What I see is a storm brewing by your

16  trying to ram a 4.5 million dollar sale down their throat under

17  terms that they may not want or to a buyer that they don't care

18  for.

19        MR. ELLETT:  Well, it's a cash buyer.  I mean we're

20  not selling our interest.  We're selling the whole complex.

21        THE COURT:  Understood.

22        MR. ELLETT:  Well, they --

23        THE COURT:  But you heard Mr. Morrill say you can't

24  do that without their consent.

25        MR. ELLETT:  Well, but they've -- in the letter right

1  here they're approving a 4.375.  They're fine with that, on

2  February 21st.  And if the offer has gone up by 125,000, I

3  don't know why they wouldn't be okay with a cash buyer.

4        THE COURT:  What I'm driving at is, are we headed for

5  litigation in this Court and some other court if you just

6  proceed on and try to have that sale forced through?

7        MR. ELLETT:  I don't think so.  I think they'll be

8  jumping for joy and so will my client if the sale closes.  I

9  think --

10        THE COURT:  I didn't see much joy with Mr. Morrill so

11  far.

12        MR. ELLETT:  What's that?

13        THE COURT:  I didn't see much joy with Mr. Morrill so

14  far.

15        MR. MORRILL:  No joy in Morrillville.

16        MR. ELLETT:  Yeah.  Well, I think that's because he's

17  trying to do something else.  And so, Your Honor, in his

18  February 12th letter right here, he says, you know, "If we

19  close within 120 days on the 4.375, that's fine.  We'll do

20  that."  So in fairness to him, his offer was, "Look, if we

21  close on the 4.375 sale, that'll be the deal.  If not, you can

22  take 3.86."  Okay.

23        THE COURT:  Okay.

24        MR. ELLETT:  And we think our options are different.

25  Our options are if we can close on the 4.375, that's good, but

1  maybe we can find another buyer that shows up that's better,

2  which we have, which is 4.5.

3  　　　　THE COURT:  So what I'm hearing is number one, this

4  is an estate violation as to what Mr. Morrill's clients are

5  trying to do.  Number two, this is an executory contract.

6  There is significant material present performance due.  And

7  number three, don't let them steal this property.  It's worth a

8  lot more than they're trying to pay us.

9  　　　　MR. ELLETT:  Yeah.  That's -- it's worth a lot more

10 than they've been offering.  There's a way to buy something at

11 fair market value.  Go negotiate with the other side.  Fair

12 market value is what a willing buyer under no compulsion to buy

13 and a willing seller under no compulsion to sell will accept.

14 This is a compulsion.  This is an arbitration.  If they want to

15 negotiate with us in good faith, we'll be happy.  We don't care

16 if we sell the apartment complex to a third party or if we sell

17 our interest out to them.  We're happy with it.  We just want a

18 fair market value and we want cash now.

19 　　　　And one of the most objectionable things about what

20 they're doing is they're going to give us an unsecured note

21 from an LLC.  How do we know we'll ever see anything on that?

22 We may end up just being a creditor in their bankruptcy.  And

23 right now, they're not a creditor in ours, they're just a

24 disgruntled party.

25 　　　　Your Honor, the other thing is the stay is to be

1  interpreted broadly.  Exceptions are to be interpreted narrowly

2  under the Ninth Circuit law.  There has been no pointing to any

3  exception that he thinks that his conduct fits inside.  He

4  instead says, "Well, we're not a hungry creditor.  We're not

5  trying to take advantage."  Well, we disagree with the second

6  one.  We think they are.  They're not a hungry creditor because

7  we don't owe them any money.  That's the only reason they're

8  not a hungry creditor.  What they are is a hungry partner

9  trying to take advantage of our bankruptcy.  And I don't think

10  the stay allows them to do that.

11         He also argues though about a willful, you know what,

12  I'll stop on the willful estate violation because I think

13  that's still to come.  That's part of our motion on the TRO.

14      (End of Portion Designated for Transcription)

15

16

17

18      I certify that the foregoing is a correct transcript from

19  excerpts of the record of proceedings in the above-entitled

20  matter.

21

22  Dated: November 13, 2014                    *Dianna Aldson*

23                                       AVTranz, Inc.
                                         845 North 3rd Avenue
                                         Phoenix, AZ  85003
24

25